### In re SILBERSTEIN.

### Ex parte W. L. DOUGLAS SHOE CO.

### (District Court, S. D. New York. April, 1915.)

1. BANKRUPTCY ⟨⟩384 — COMPOSITION — CONFIRMATION — FAILURE TO KEEP BOOKS.

Confirmation of a composition will not be denied, on the ground that the bankrupt failed to keep proper books, unless an intent to conceal his condition is shown.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 590–592; Dec. Dig. ⟨⟩384.]

2. BANKRUPTCY ⟨⟩384—COMPOSITION—CONFIRMATION—KEEPING BOOKS.

A bankrupt, who did a cash business, kept a merchandise ledger, showing his accounts with all those from whom he purchased on credit. His check book and bank book were practically the only other books kept, and he kept no record of personal loans from friends or connections. *Held* that, as the bankrupt could have determined his condition from the record of his indebtedness and stock and cash on hand, confirmation of a composition offered will not be denied on the ground that he failed to keep books with the intent to conceal his condition.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 590–592; Dec. Dig. ⟨⟩384.]

3. BANKRUPTCY ⟨⟩384—COMPOSITION—CONFIRMATION—TRANSFERS IN FRAUD OF CREDITORS.

Where a father made payments to his wife and to his daughter for her marriage trousseau, and it appeared that some of the payments at least were made after he knew of his bankruptcy, but it was not shown whether the daughter was not at that time an infant, or that the father did not suppose that he was bound to make provision for her, such payments, being reasonable, will not be held in fraud of creditors, and hence an offered composition will not be denied, on the ground that the bankrupt had made transfers in fraud of creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 590–592; Dec. Dig. ⟨⟩384.]

4. BANKRUPTCY ⟨⟩384—COMPOSITION—RIGHT TO.

Where there is no ground for suspicion of collusion, the will of the majority of the creditors governs, and a composition desired by them will be confirmed.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 590–592; Dec. Dig. ⟨⟩384.]

In the matter of the bankruptcy of Isaac Silberstein. On motion to confirm a report of the master, overruling objections to a composition by the W. L. Douglas Shoe Company, and recommending confirmation. Report and composition confirmed.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Leopold Freiman and Samuel J. Rawak, both of New York City, for the motion.

Lesser Bros., of New York City (William Lesser, of New York City, of counsel), opposed.

LEARNED HAND, District Judge.  [1] The chief emphasis of this opposition lies in the failure to keep certain definite books, from which the creditor insists that the intent to conceal necessarily follows.  I agree that the bankrupt need fail to keep only one book in order to lose his discharge; it is enough if he omits it with specific intent, yet that intent, though, of course, it always lies in inference, must nevertheless be proved to exist.  It is not enough, however, to show that the necessary consequence of the omission will be to conceal his condition, any more than it is enough to show in a trial for murder that the necessary result of the defendant's act was to kill his victim.  In all cases of specific intent, an actual conscious state is one of the elements of the case.  This is a distinction more frequently forgotten than one might suppose from its simplicity, and there are undoubtedly authorities which forget it.

[2] In the case at bar the bankrupt did keep a merchandise ledger, which showed his accounts with all those from whom he purchased on credit.  He kept very little else, nothing but his check book and his passbook, and it is said that we must infer that he omitted to keep others, because he intended concealment.  I cannot agree that the case is like Re Weston (C. C. A., 2d Cir.) 30 Am. Bankr. Rep. 647, 206 Fed. 282, 124 C. C. A. 345, or Re Linker (D. C., N. Y.) 33 Am. Bankr. Rep. 709, 222 Fed. 173, in each of which the bankrupt kept no record comparable with the merchandise ledger, and in one of which he was a broker with complicated relations with many customers.  In the case at bar the most important transactions, which were the purchases on credit, were properly recorded.  The sales were for cash and paid over the counter; there were no accounts to keep with customers.  The purchases from auctioneers were for cash; no account resulted from them.  The only thing which to my mind gives any color whatever to the specification is the failure to record the loans from friends or connections, aggregating about $2,000.  All these loans were what traders in a somewhat mysterious phrase sometimes call "personal" indebtedness.  There is no evidence that at the time of borrowing the bankrupt expected that his books would ever be examined by anybody, or that his failure to make entries was against such future inspection.  No motive can be suggested which would have led him to omit them from his records, unless from the outset he was contemplating failure.

I confess I do not see why the bankrupt should have kept more books than he did, or how they would have practically helped him, if he had.  Of course, they would tell more about his condition now; but the law does not compel a man to keep for his creditors books that he does not need for himself.  There is no such implication when one gets credit.  The law does say that, if the debtor omits to keep records for the purpose of concealment, he is at fault; but that is a very different thing.  Silberstein had in the ledger all he needed to tell

where he stood; he had his deposit book, the stock on his shelves, his merchandise debts in the ledger, and this "personal" indebtedness in his memory. The last item alone might have needed a record; but his omission I attribute to neglect, as he says.

[3] The next specification relates to the payments of $300 to the wife and $100 to the daughter Anna, in January. It is a little uncertain whether the $100 payment was a single sum or not. On this hearing it appears to have been given in driblets, but when first stated it read like one payment. I cannot see that the payment of $200 in October was shown to be with intent to defraud creditors, because, though business had been bad for the year, and he had paid out much money to Heimlich, we cannot say that he had lost all hope, and that he did not think it would relieve him substantially to get Anna safely off his hands and fastened upon one who could support her.

At the time of the January payments, however, he must have known himself to be at the end of his rope, and the payments must rest upon his right to make them. A father who assigns on the day after his daughter's wedding we can hardly suppose had no premonitions of his position. Was this payment, after he had learned that all hope was gone, a transfer in fraud of creditors? This depends upon whether the payment was upon any existing obligation. Even an insolvent has his duties to his family, and must support them, though his creditors suffer. If it is part of a father's obligation to see his daughter decently married and give her a reasonable outfit, I cannot say that the outlay is in fraud of creditors. One may expect more of a nicer sense of honor, but one may not call it fraud.

The question whether such a payment lies within the father's obligation is the same as whether the infant would have been responsible for it as for a necessary. I have been able to find only two cases of wedding clothes as infant's necessaries, but they both favor the bankrupt here. Sams v. Stockton, 14 B. Mon. (Ky.) 232; Jordan v. Coffield, 70 N. C. 110. The same rule applies to mourning. De Moss v. Giltner, 5 Ky. Law Rep. 691. If an insolvent father keeps within measure, he is not guilty of fraud, when he gives his daughter a trousseau. No one suggests that the amount here given was too large, or that he seized the opportunity as a pretense for giving the girl more than she needed. It is true that on April 22d, Anna was 21 years old; but it does not appear that when married she was not still a minor, or that the bankrupt supposed his duties to her to be different from those of a minor.

[4] The other specifications need little attention. As to the third, it seems enough to say that the sales of 1912 of $40,000 had dropped to $25,000 in 1913, and may well have dropped to $12,000 in 1913, when business was very bad. As to the fourth, it is quite impossible to attribute perjury to such a valuation of property put in bankruptcy schedules. Any one familiar with bankruptcy sales knows that the sale values at auction may easily be 50 per cent. of the purchase price. The only valuable estimate of such values would be an auctioneer's estimate. Besides, the stock was there for any one to estimate for himself. The fifth is trivial. The sixth is answered in my judgment by

the great preponderance of creditors who favor the composition. If there be no ground for suspicion of collusion, the will of the majority ought ordinarily to control upon the wisdom of accepting the offer in composition.

I can see little merit in any of the specifications, except the second; had it not been for that, I should have taxed the disbursements upon the creditor. As it is, I will follow the usual custom and let the bankrupt pay the expense of the reference; no costs.

Report confirmed; composition confirmed.

---

### THE IMP.

#### (District Court, S. D. New York. June 16, 1915.)

MUNICIPAL CORPORATIONS ⬤⟶849—WHARVES—SUPERVISION BY CITY—NEGLIGENCE OF WHARFINGER—NOTICE GIVEN BY THIRD PERSON.

 The city of New York, *held* not liable for injury to other vessels from the capsizing of a sand, barge lying in the inner end of a slip by reason of the shallowness of the water at low tide and the presence of stones on the bottom, where the master of the barge was duly notified of the danger at night by an employé of the consignee of the cargo, and advised not to move to the position until high tide in the morning, but disregarded the warning. One of the injured vessels also *held* in fault for moving in and making fast to the barge, although her master knew the danger, and entitled to recover only half damages from the barge.

 [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1806; Dec. Dig. ⬤⟶849.]

In Admiralty. On petition by Louis J. Schussler, owner of the scow Imp, for limitation of liability, the City of New York was impleaded. On determination of liability for injury to the vessels Governor Hill and Clearfield. Decree against the Imp, and in favor of the City.

 The Governor Hill and her master, McDermott, and the Clearfield, each filed a libel against the city of New York and against the barge Imp. The Imp limited its liability and has brought in the city. All proceedings came up for trial on the following state of facts:

 The northwest corner of the East River slip formed by the bulkhead and Piers 60 and 61 is shallow. At low water it is nearly uncovered and the bottom has stones. This was known to the city and to several former masters of the Imp, employés of the Phœnix Sand & Gravel Company. It has been the custom for that company to consign cargoes of sand to Keating at the bulkhead of the slip close to the Sixty-First street pier, and the masters had seen to it that the cargo was discharged at high water, so that, if the scow remained at low water, she was light. The Imp's master on his first voyage to Keating's made fast alongside a brick barge, which itself lay on the south side of Pier 61, and well out from the bulkhead. Later he moved in alongside the pier side and about 17 feet from the bulkhead. The Clearfield was alongside of him, further out from the bulkhead and in a place of safety. The Governor Hill lay alongside the bulkhead, but too far south to be in danger from shallow water. As the tide fell the Imp took the ground forward, probably on a stone close to the pier, and slowly heeled to port, being bows in; finally, at about dead low water she turned turtle, dumping her load of sand. As she upset she damaged the Clearfield and the bows of the Governor Hill.

---

 ⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes